

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## MCALLEN DIVISION

ENTERED
11/05/2015

| | | |
|---|---|---|
| IN RE: | § | |
| JCP PROPERTIES, LTD.; aka JCP | § | **CASE NO: 15-70391** |
| PROPERTIES, LTD | § | |
|     Debtor | § | |
| | § | **CHAPTER  11** |

**MEMORANDUM OPINION**
**REGARDING**

**JCP PROPERTIES, LTD'S MOTION FOR FINAL DECREE,**

**RREF CB SBL II-TX, LLC'S MOTION TO DISMISS**
**&**
**MOTION FOR RELIEF FROM THE AUTOMATIC STAY**
[Resolving Case No. 15-70391; ECF Nos. 10 & 14]
**&**
[Resolving Case No. 11-70827; ECF No. 95]

## I. Introduction

Before this Court are three pending motions from two separate, but factually overlapping chapter 11 cases. In October of 2011, Debtor filed its first chapter 11 case, thereafter confirming a plan in October of 2012. The plan has since been substantially consummated. This first chapter 11 case was closed by final decree in November of 2012 but, Debtor reopened that case in June 2015. Debtor now motions for a Final Decree to close the first chapter 11 case.

After the first chapter 11 case was reopened, Debtor filed a second chapter 11 case in August 2015. Debtor has not yet offered a plan, but it seeks to fashion a new chapter 11 plan aimed at liquidation. Debtor's secured creditor now motions to have the successive, second chapter 11 case dismissed and alternatively motions for relief from the automatic stay.

Due to the substantially interrelated nature of these two chapter 11 cases and the three

pending motions therein, this Court will now consider the pending motions jointly.

## II.  Findings Of Fact

To the extent that any Finding of Fact constitutes a Conclusion of Law, it is adopted as such. To the extent that any Conclusion of Law constitutes a Finding of Fact, it is adopted as such.

### (A)  JCP Properties, Ltd.'s First Chapter 11 ("*JCP I*")

1.     On December 5, 2011 JCP Properties, Ltd (hereinafter "*JCP I*" or "*Debtor*") filed for relief under Title 11, chapter 11 of the United States Bankruptcy Code.[1]  [Case No. 11-70827, ECF No. 1].

2.     On December 10, 2011, JCP I filed its Schedules and Statement of Financial Affairs.  [ECF No. 10].

3.     On December 10, 2011, JCP I listed the following real property on Schedule A, [ECF No. 10]:

| Property Description | Value | Lien |
|---|---|---|
| | | |
| Lots 3, 4, 7, & 8 Bonita Homes Subdivision, an Addition to the City of Weslaco, Hidalgo County Texas | $414,448.00 | $425,433.48 |
| | | |
| Lots 7, 8, 9, 10, 11 &12 Bonita Homes Subdivision, an Addition to the City of Weslaco, Hidalgo County Texas | $234,000.00 | $153,089.84 |

4.     On December 10, 2011, JCP I listed Compass Bank, f/k/a Texas State Bank, on Schedule D as the lienholder of the above referenced properties.  [ECF No. 10].

5.     On March 23, 2012, JCP I filed a Motion To Extend the Exclusivity Period For

---

[1] Any reference to "*Code*" or "*Bankruptcy Code*" is a reference to the United States Bankruptcy Code, 11 U.S.C., or any section (i.e. §) thereof refers to the corresponding section in 11 U.S.C.

Filing A Plan of Reorganization (hereinafter "***Motion To Extend Exclusivity***").  [ECF No. 30].

6.      On March 16, 2012, this Court granted the Motion To Extend Exclusivity to July 2, 2012.  [ECF No. 31].

7.      On April 17, 2012, Compass Bank filed its Proof of Claim #10 in the amount of $137,547.41 and pre-petition arrears in the amount of $2,493.20 (hereinafter "***Note #1***").  Note #1 was issued on September 27, 2005 and carried an interest rate of 9.5%, and the Deed of Trust indicated a Second Lien on Lots 3, 7, 8,  & 9 of Bonita Homes and valued the collateral at $414,448.00.  Note #1 called for monthly interest payments only until maturity.  The original maturity date of Note #1 was April 1, 2006, but on February 3, 2006 Note #1 was extended and renewed and given a new maturity date of May 1, 2011, and it called for monthly installments of principal and interest in the amount of $1,282.08.

8.      On April 17, 2012, Compass Bank filed its Proof of Claim #11 in the amount of $155,268.81 with pre-petition arrears of $475.00 (hereinafter "***Note #2***").  Note #2 was issued on January 6, 2005 and carried an interest rate of 6%. Additionally, the Deed of Trust indicated a First Lien on Lots 9, 10, 11 & 12 Bonita Homes Subdivision in Hidalgo County Texas and valued the collateral at $234,000.00. This was an interest only payable in semi-annual installments until maturity.  Note # 2 matured January 6, 2006. On April 7, 2006, Note #2 was renewed and extended and given a new maturity date of August 11, 2011, and it called for monthly installments of principal and interest in the amount of $1,549.00.

9.      On April 17, 2012, Compass Bank filed its Proof of Claim #12 in the amount of $289,723.38 with pre-petition arrears of $3,494.96 (hereinafter "***Note #3***"). Note #3 was issued on April 1, 2005 and carried an interest rate of 9.5%. Additionally, the Deed of Trust indicated a

First Lien on Lots 3, 4, 7 & 8 Bonita Homes Subdivision in Hidalgo County Texas and valued the collateral at $414,448.00. This original $300,000.00 loan was intended for the construction of four two story duplexes. This was an interest only payable in quarterly installments until maturity. Note # 3 was to mature on April 1, 2006. On May 1, 2005 Note #3 was renewed and extended and given a new maturity date of May 1, 2009, and it called for monthly installments of principal and interest in the amount of $2,783.48. Then on July 10, 2009, JCP I executed a "Change In Terms Agreement" with Compass Bank, which called for monthly payments of principal and interest in the amount of $2,796.02 commencing August 10, 2008 and maturing on July 10, 2028.

10. On June 29, 2012, JCP I filed its Second Motion To Extend Exclusivity. [ECF No. 40].

11. On July 23, 2012, this Court granted JCP I's request and issued an order extending the exclusivity period to August 1, 2012. [ECF No. 42].

12. On August 1, 2012, JCP I filed its Disclosure Statement and Plan of Reorganization. [ECF No. 44 & 45].

13. JCP I's Plan, [ECF No. 45], listed treatment of the Compass Bank's Claims as follows:

| Class No. | Claim No. | Amount | Treatment |
|---|---|---|---|
|  |  |  |  |
| 4 | 10 | $137, 547.41 | The Plan indicated that this Note would be consolidated with the Note in Class 4. The Plan further required JCP I to continue its payments to the applicable insurance agency regarding Compass Bank's collateral. |
|  |  |  |  |
| 5 | 11 | $155, 268.81 | The Plan called for Lots 9, 10, 11, & 12, which JCP valued at $234,000.00 to be surrendered to Compass Bank in full satisfaction of its Lien. |
|  |  |  |  |

| 3 | 12 | $289, 723.00 | The Plan indicated that this Note would be combined with the Note in Class 4 for a combined total Note of $427,270.41 to be repaid based on an amortization of 30 years with an interest rate of 6% and maturity date of 5 years after the Effective Date of the Plan.  The Plan further required that JCP continue its payments to the applicable insurance agency regarding Compass Bank's collateral. |

14.     On September 9, 2012, this Court approved JCP I's Disclosure Statement and set Confirmation of the Plan for October 24, 2012.  [ECF No. 52].

15.     On October 22, 2012, Compass Bank filed its Objection To Confirmation.  [ECF No. 60].  Essentially, Compass Bank objected to JCP I's proposal of combining its Class 3 and 4 Claims into one single Note, since the Note in Class 4 had already been sold to a third party and was no longer owned by Compass Bank. Compass Bank also objected to the proposed repayment terms, interest rate, and failure to include arrears of $22,268.81 and alleged that JCP I had not made any payments to Compass Bank since December 9, 2011 (or since the filing of the bankruptcy petition).

16.     On October 24, 2012, this Court Confirmed JCP I's Plan.  [ECF No. 64].  The Order Confirming Plan contained language that presumably cured Compass Bank's Objections. The Order, in essence, contained provisions that provided for (i) $22,368.16 in arrears; (ii) for JCP I to issue a cashier's check in the amount of $30,756.22 (or a lesser agreed amount) to Compass Bank by October 26, 2012; (iii) for the remaining balance of the Note to be refinanced at 6.5% interest amortized over 30 years with a maturity date of 5 years after the Effective Date; (iv) for the Class 4 Claim transferred to Quantum Services, Inc. in the amount of $137,547.41 to be repaid at 6% interest amortized over a 30 year term and with a maturity date of 5 years after the Effective Date; (v) and for the Class 5 Claim transferred to Quantum Services, Inc. in the

amount of $289,723.38 to be surrendered to Compass Bank in full satisfaction of its claim.

17.     On October 25, 2012, this Court issued its Post Confirmation Order.  [ECF No. 65].

18.     On October 26, 2012, Compass Bank filed a Motion For Entry of An Agreed Order regarding Conditioning the Automatic Stay (hereinafter "***Compass Bank Agreed Order***"). [ECF No. 66].

19.     On November 19, 2012, the Court entered the Compass Bank Agreed Order. [ECF No. 72].  The Agreed Order directed JCP I to issue a cashier's check to Compass Bank in the amount of $22,368.16 no later than October 26, 2012.  The Order also called for JCP I to pay the remaining post-petition arrears in the amount of $8,388.06 by making 5 monthly payments in the amount of $1,000.00 and one final payment in the amount of $3,388.06, with payments commencing November 25, 2012. The Order further stated that JCP I is to remain current on payments called for within its confirmed plan.  The Order further called for JCP I to maintain current insurance and the payment of ad valorem taxes on the Bank's collateral.  The Order also provided that should JCP I default in any manner provided for under the Agreed Order, then Compass Bank would be required to send no more than two written notices of default to JCP I and provide it with a ten day opportunity to cure, the uncured default of which would terminate the automatic stay and allow Compass Bank to exercise its state law remedies, including foreclosure of Lots 3, 4, 7, & 8.  Finally, the Order stated that "[t]his Order supplements the Order Confirming the Plan of Reorganization."  [ECF No. 64].

20.     On November 29, 2012, this Court entered its Order of Final Decree, which closed the case.  [ECF No. 76].

21.     On May 14, 2015, JCP I filed a Motion To Re-Open the Chapter 11 Case.  [ECF No. 79].   In the Motion, JCP I alleged that it required the case to be re-opened so that it could enforce the terms of the confirmed plan.  Essentially, JCP I alleged that RREF CB SBL II-TX, LLC, (hereinafter "***RREF***"), successor in interest to Compass Bank, had failed to release JCP I and the Guarantor pursuant to the terms of Class 5 in Confirmation Order, which called for the surrender of Lots 9, 10, 11, and 12 in full satisfaction of its Lien, and that RREF had filed a lawsuit against the Guarantor Julio C. Perales on his guarantee.  *Id.*

22.     On June 4, 2015, RREF filed its Objection To JCP I's Motion To Reopen its closed chapter 11 case.  [ECF No. 80].

23.     On June 17, 2015, the Court conducted a hearing and took the matter under advisement.  [ECF No. 87].

24.     On June 19, 2015, the Court granted JCP I's Motion and re-opened the closed chapter 11 case.  [ECF No. 90].

25.     On June 30, 2015, RREF filed its Motion To Confirm Termination of The Automatic Stay (hereinafter "***Motion For Relief***").  [ECF No. 92].  In its Motion For Relief, RREF alleged that JCP I, post-confirmation, defaulted in its payments regarding the Class 4 Claim (which involved Lots 3, 4, 7, & 8), which called for monthly payments of $824.67, and has not made any payments since November 4, 2012. Allegedly, this amounted to a total post-confirmation default amount of $25,589.44. RREF additionally argued that the automatic stay terminated upon confirmation of the chapter 11 plan, which occurred October 24, 2012.

26.     On July 16, 2015, this Court granted RREF's Motion For Relief and allowed RREF to exercise its State law remedies, including foreclosure, against the collateral. The Court

also ordered fee shifting in the amount of $1,000.00.  [ECF No. 93].

    27.    On September 21, 2015, JCP I filed its Motion For Final Decree alleging, inter alia, that substantial consummation of the plan had occurred. Additionally, JCP I alleged that an adversary complaint would be filed against a creditor, presumably RREF, at a later time and in a different proceeding.  [ECF No. 95].

    28.    On September 28, 2015, RREF filed its Objection To JCP I's Motion For Final Decree arguing, inter alia, that the plan has not been substantially consummated in that, despite the passage of almost three years, JCP I has failed to timely commence payments to RREF under the terms of the confirmed plan. In fact, JCP I has only made one partial payment and missed approximately twenty-five payments.

## B.  JCP Properties, Ltd.'s Second Chapter 11 ("*JCP II*")

    29.    On August 2, 2015, JCP II filed its second chapter 11 proceeding.  [Case No. 15-70391, ECF No. 1].

    30.    On August 5, 2015, RREF filed its Motion To Dismiss, essentially arguing that since JCP I's first bankruptcy is still open, JCP II cannot proceed where there are two concurrently active chapter 11 proceedings involving the same debtor.  [ECF No. 10].  RREF further argued that it had posted some property (Lots 3, 4, 7, & 8) (hereinafter "***Real Property***") for a non-judicial foreclosure sale that was to be conducted on August 4, 2015, but upon learning of the new chapter 11 filing, RREF removed the property from the foreclosure sale.  *Id*.  RREF further alleged that JCP I was now over 34 monthly payments in arrears post-confirmation of JCP I's first bankruptcy plan. RREF further alleges that it posted the Real Property for a May 5, 2015 non-judicial foreclosure.  On May 4, 2015, JCP I filed a Motion seeking a Temporary

Restraining Order (hereinafter "***TRO***") in the 398th District Court, Hidalgo County Texas, Cause No. C-1901-15-I (hereinafter "***State Court***").   On May 18, 2015, the State Court conducted a hearing and dissolved the TRO. RREF further alleges that on May 14, 2015, in anticipation of the dissolution of the TRO, JCP I filed its Motion To Reopen its 2011 chapter 11 case in an attempt to reinstate the automatic stay.   RREF filed its Motion to Confirm Termination of the Automatic Stay, and the Court entered RREF's proposed order.  [ECF Nos. 92-93].

31.     On August 6, 2015, RREF filed its Motion For Relief From the Automatic Stay. [ECF No. 14].  RREF seeks relief from the automatic stay should the court not grant its Motion to Dismiss.

## III.  Legal Standard

### A.  Jurisdiction & Venue

This Court holds jurisdiction pursuant to 28 U.S.C. § 1334, which provides that "the district courts shall have original and exclusive jurisdiction of all cases under title 11." This is a core matter for the purpose of 11 U.S.C. § 157, which provides that bankruptcy judges may issue final orders or judgments where the matter is determined to be core. Section 157 enumerates a non-exclusive list of core matters, which includes "matters concerning the administration of the estate."  11 U.S.C. § 157.  The decision to dismiss a chapter 11 case, grant relief from stay, or issue a final decree closing a case is certainly one that involves the administration of an estate. Therefore, jurisdiction is proper under the statutory provisions governing bankruptcy courts.

This Court may only hear a case in which venue is proper. Venue with respect to cases under title 11 is governed by 28 U.S.C. § 1408, which designates that venue may be commenced in the district "in which the domicile, residence, principal place of business in the United States,

or principal assets in the United States, of the person or entity…" have been located for the one 180 day period preceding such commencement. In its petitions, Debtor designates its principal place of business as Hidalgo County. Therefore, venue is proper.

**B.  Constitutional Authority To Enter A Final Order**

This Court also has an independent duty to evaluate whether it has the constitutional authority to sign a final order. *Stern v. Marshall*, 131 S. Ct. 2594 (2011).  In *Stern v. Marshall*, the Supreme Court considered the constitutional limitations that Article III imposes upon § 157's grant of final order and judgment powers to non-Article III courts. *Id.*  The Supreme Court held that § 157 violated Article III to the extent that it authorized bankruptcy judges to enter final judgments on certain matters. *Id.* at 2616.  The Court found that the particular bankruptcy ruling in dispute did not stem from bankruptcy itself, nor would it necessarily be resolved in the claims allowance process, and it only rested in a state law counterclaim by the estate. *Id.* at 2618.  The Court reasoned that bankruptcy judges are not protected by the lifetime tenure attribute held by Article III judges, but they were performing Article III judgments by judging on "all matters of fact and law" with finality. *Id.* at 2618-19.  Hence, the Court held that Article III imposes some restrictions against a bankruptcy judge's power to rule with finality. The Court found that a solely state law based counterclaim, while statutorily within the bankruptcy judge's purview, escaped a bankruptcy court's constitutional authority. *Id.* at 2620.  This Court reads *Stern* to authorize final judgments only where the issue is rooted in a right created by federal bankruptcy or the resolution of which relies on the claims allowance process. In other words, this Court may issue final judgments and orders where the issue "arises in" or "arises under" bankruptcy, but not where the issue is merely "related to" bankruptcy. *See* 28 U.S.C. § 157.  However, even where

the case does create a "Stern problem," Article III will be satisfied where the parties to the case knowingly and voluntarily consent to the bankruptcy court's power to issue final judgments. *Wellness Int'l Network v. Sharif*, 135 S. Ct. 1932, 1938-39 (2015).

The matters at bar require this Court to issue rulings on a motion to dismiss, a motion for relief from the automatic stay, and a motion for a final decree, all of which solely concern federal bankruptcy law.  *See* 11 U.S.C. § 1112 (chapter 11 dismissal); *see also* 11 U.S.C. § 362(d) (relief from the automatic stay); Fed. R. Bankr. P. 3022 (final decree).   Therefore, this Court holds constitutional authority to enter a final order and judgment with respect to the matter at bar.

### IV.  Conclusions Of Law

**A. Motion For Final Decree**

JCP I asks this Court to issue a Final Decree closing the 11-70827 chapter 11 case, arguing that the confirmed chapter 11 plan has been substantially consummated and alleging that it no longer wishes to pursue an adversary proceeding in the 2011 case, which was JCP I's purported reason for reopening the case.  [Case No. 11-70827; ECF No. 95].  RREF responds that JCP I's failure to substantially consummate the plan would make a Final Decree inappropriate.  [ECF No. 99].

Debtor and RREF are correct in intuiting that substantial consummation is the pivotal question here to determine the propriety of closing the JCP I case by Final Decree. Bankruptcy Rule 3022 provides that "[a]fter an estate is fully administered in a chapter 11 reorganization case, the court… shall enter a final decree closing the case."  Fed. R. Bankr. P. 3022; *see also* 11 U.S.C. § 350(a) ("[a]ter an estate is fully administered and the court has discharged the trustee, the court shall close the case").  Neither the Bankruptcy Code nor the Bankruptcy Rules define

"fully administered."  *In re SLI, Inc.*, 2005 WL 1668396 at *1 (Bankr. D. Del. June 24, 2005). However, courts have looked to the advisory committee's notes on Bankruptcy Rule 3022's in seeking guidance as to the meaning of "fully administered."  *See e.g. In re Valence Technology, Inc.*, 2014 WL 5320632 at *1 (Bankr. W.D. Tex. Oct. 17, 2014); *In re SLI, Inc.*, 2005 WL 1668396 at *1.  According to the Advisory Committee, in determining the entry of a Final Decree:

> Entry of a final decree closing a chapter 11 case should not be delayed solely because the payments required by the plan have not been completed. Factors that the court should consider in determining whether the estate has been fully administered include (1) whether the order confirming the plan has become final, (2) whether deposits required by the plan have been distributed, (3) whether the property proposed by the plan to be transferred has been transferred, (4) whether the debtor or the successor of the debtor under the plan has assumed the business or the management of the property dealt with by the plan, (5) whether payments under the plan have commenced, and (6) whether all motions, contested matters, and adversary proceedings have been finally resolved.

Fed. R. Bankr. P. 3022 advisory committee's note to 1991 amendment.  Under a reading of the definition of "substantial consummation," it is clear that the issue of whether JCP I has substantially consummated its plan weighs on the propriety of issuing a final decree closing its chapter 11 case. The Bankruptcy Code defines "substantial consummation" as the:

> (A) transfer of all or substantially all of the property proposed by the plan to be transferred;
>
> (B) assumption by the debtor or by the successor to the debtor under the plan of the

business or of the management of all or substantially all of the property dealt with by the plan; and

(C) commencement of distribution under the plan.

11 U.S.C. § 1101(2). The Code's definition in § 1101(2) is written in conjunctive terms, thus requiring all three elements to be met in order to find that there has been substantial consummation. See *United States v. Novak*, 86 B.R. 625 (Bankr. D.S.D. 1988). In other words, all three elements under § 1101(2) together comprise the exclusive definition of substantial consummation for the purpose of a chapter 11 plan. It is clear that all three of the §1101(2) substantial consummation elements are incorporated into Rule 3022 as part of the committee's six factor guidance for the definition of "fully administered." Both § 1101(2) and Rule 3022's enumerated lists contain a separate item or element for: the transfer of property proposed for transfer under the plan; the debtor's assumption of management of the estate as a going concern; and the commencement of plan payments. Therefore, reading § 1101(2) and Rule 3022 *in pari materia*,[2] it is logical to conclude that the substantial consummation of a plan is a significant factor in deciding whether to enter a Final Decree closing a chapter 11 case.

This Court turns to whether Rule 3022's definition of "fully administered" has been met in the 11-70827 case, such that this Court is compelled to enter a final decree closing the case. Fed. R. Bankr. P. 3022 ("shall enter a final decree"); 11 U.S.C. § 350 ("the court shall close the case"). Regarding factor (1) of the Committee Notes on Rule 3022, an order confirming the chapter 11 plan has become final by virtue of this Court's Confirmation Order. [Case No. 11-70827; ECF No. 64]. Factor (2) is irrelevant, since no deposits have been required by the plan.

---

[2] "Loosely, in conjunction with." *In Pari Materia, Black's Law Dictionary* (10th ed. 2014).

Factor (6), in determining whether all motions, contested matters, and adversary proceedings have been finally resolved, is met for several reasons. First, no adversary has been opened, and JCP I attests that it has no desire to seek an adversary in this case.  [Case No. 11-70827; ECF No. 95].  Second, the only matter that is contested in this case is whether there should be a Final Decree to close the case. With three of the factors disposed in favor of a Final Decree, this Court is left to consider factors (3)-(5), corresponding to whether substantial consummation of the chapter 11 plan has been achieved.

"Substantial consummation is a statutory measure for determining whether a reorganization plan may be amended or modified by the bankruptcy court."  *Matter of Manges*, 29 F.3d 1034, 1040 (5th Cir. 1994).  Under § 1127(b), where a plan has been confirmed in a non-individual chapter 11 case, the debtor or plan proponent has an opportunity to modify the plan before substantial consummation has been achieved. By implication, a plan may not be modified by a non-individual after substantial consummation has been achieved. *See In re McMahan*, 481 B.R. 901, 920 (Bankr. S.D. Tex. 2012); *see also* 11 U.S.C. § 1127(b).  Moreover, under § 1141(a), the confirmation of a chapter 11 plan generally makes its terms binding upon all contemplated parties. The combined effects of §§ 1127(b) and 1141(a) in a non-individual chapter 11 case are to make a confirmed and substantially consummated plan carry a weight of finality. Thus, this Court finds that substantial consummation is an important component to determining whether a case has been "fully administered" for the purpose of issuing a Final Decree pursuant to Rule 3022.

The first required element for substantial consummation is whether there has been a "transfer of all or substantially all of the property proposed by the plan to be transferred."  §

1101(2)(A).   Under JCP I's Plan of Reorganization, JCP I proposed to transfer Lots 9, 10, 11, and 12 of JCP I's Bonita Homes property to BBVA Compass Bank in satisfaction of its Class 5 claim.  [Case No. 11-70827; ECF No. 45].   These lots represent the only property contemplated for transfer, and this Court's Confirmation Order affirmed the treatment of Class 5.  [Case No. 11-70827; ECF No. 64].   At a hearing on the instant motions, RREF admitted that Lots 9, 10, 11, and 12 have been transferred through foreclosure on April 07, 2015, before Debtor had reopened the JCP I case.  [Creditor Ex. K at 17]; s*ee also* [Debtor Ex. G].   Having transferred all of the plan's contemplated Lots 9, 10, 11, and 12 to RREF, JCP I has shown that it meets the first element for substantial consummation.

The second required element for substantial consummation is whether there has been an "assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan."  § 1101(2)(B). JCP I has shown by testimony and evidence that it was revested of the remaining Lots 3, 4, 7, and 8 and assumed the operations of its business as a going concern following the confirmation of the plan. For example, JCP I provided Year 2015 tax assessments showing its ownership of Lots 3, 4, 7, and 8.  [Debtor Ex. P-Q].   RREF does not dispute JCP I's ownership of Lots 3, 4, 7, and 8, comprising the remainder of JCP I's property.  [Case No. 11-70827; ECF No. 10, 5]. RREF also does not challenge JCP I's operation as a business following confirmation of the plan, and Debtor testified that it had spent money on business needs such as tax obligations.  [Debtor Ex. N].

The third required element for substantial consummation is whether there has been a "commencement of distribution under the plan."  11 U.S.C. § 1101(2)(C).  At the hearing, RREF

admitted that some payments had been made under the plan, a fact it does not otherwise belie from its pleadings.  [Case No. 11-70827; ECF No. 99 at 2] ("Debtor made a partial payment"). RREF's contest to substantial consummation is not whether any contemplated payments under the plan have been made, but rather whether JCP I has made *enough* payments as to meet RREF's suggested standard of "more than halfway."  *Id.*  The third element for substantial consummation is not so onerous in its requirement. Where elements one and two of § 1101(2)'s definition of substantial consummation concern transfers of "all or substantially all" of the contemplated *property*, the third element concerns the "commencement" of the contemplated *distribution*. To require a substantiality of distribution payments rather than a mere existence of distribution payments, where the very same definition expressly includes a substantiality component for transferred property, would render § 1101(2)'s "all or substantially all" a mere surplusage within § 1101(2).  *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("[w]e are thus reluctant to treat statutory terms as surplusage in any setting… We are especially unwilling to do so when the term occupies so pivotal a place in the statutory scheme… (internal quotation marks omitted)); *see also City of Chicago v. Environmental Defense Fund*, 511 U.S. 328, 338 (1994) (citing *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) ("it is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another" (internal quotation marks omitted)); s*ee also In re Guerrero*, 2015 WL 5302644 at *5 (Bankr. S.D. Tex. September 9, 2015) ("[w]here Congress knows how to say something, courts will presume that Congress would say it for the same effect elsewhere, and Congress's choice not to is instructive").  While "substantial" may indeed suggest "more than halfway," [Case No. 11-70827; ECF No. 99 at 2], under ordinary parlance, RREF is

erroneous in believing that § 1101(2)'s defined term "substantial consummation" subsumes the inner definition's more clearly delineated language in order to inject a substantiality component into "commencement of distribution under the plan." This Court will not dislocate § 1101(2)(C) upon the rack of such a torturous reading. Thus, for the purpose of meeting § 1101(2)(C)'s commencement test, JCP I must show that it has merely made any payments contemplated by the plan.

JCP I has admitted ample evidence that it commenced distribution under the plan for the purpose of the third element of substantial consummation. From the Order of Confirmation in the JCP I case on October 24, 2012 to March 26, 2015, JCP I made over 30 payments to Class 3. [Debtor Ex. M].  By RREF's own admission, JCP I made one payment on account of Class 4. [Creditor Ex. R at 410].  Therefore, JCP I has shown that it commenced payments under the plan.

Having shown that it has fulfilled all three elements of § 1101(2), this Court concludes that it has substantially consummated its chapter 11 plan in JCP I. Having found that all other relevant guidance under Rule 3022 has also been met, this Court concludes that JCP I's first chapter 11 case has been "fully administered" for the purpose of § 350 and Rule 3022. Therefore, this court finds it appropriate to issue a Final Decree closing case 11-70827.

**B.  Motion To Dismiss**

A party in interest may request that a bankruptcy court dismiss the debtor's case for "cause." 11 U.S.C. § 1112(b)(1).  This Court is presented with the question of whether cause to dismiss a second chapter 11 case exists where: (1) Debtor's second chapter 11 petition was filed with respect to substantially the same debts as under Debtor's first chapter 11 case; (2) the plan

from the first case was substantially consummated and defaulted; (3) the two chapter 11 cases share the same creditors; and (4) the second chapter 11 petition was filed while the first chapter 11 case was open.

Some courts have found that, as a general rule, a debtor may not have two bankruptcy cases pending simultaneously. *In re Russell*, 348 B.R. 441, 448 (Bankr. S.D. Tex. 2006); *In re Fountain*, 142 B.R. 135, 137 (Bankr. E.D. Va. 1992). However, this conclusion does not rest upon an express prohibition on simultaneous filings in the Code. *In re Whitmore*, 225 B.R. 199, 202 (Bankr. D. Idaho 1998). *In re Fountain* is instructive on this issue. In *Fountain*, the court was faced with the question of whether a chapter 13 plan was "proposed in good faith and not by any means prohibited by law. *Fountain* 142 B.R. at 137 (citing 11 U.S.C. § 1325(a)(3)). There, the debtor previously filed a chapter 13 petition, the chapter 13 plan for that case was confirmed, and without dismissing that chapter 13 case or consummating the plan, the debtor filed a second petition for chapter 13 relief. *Id.* In rejecting the second chapter 13 plan, the court noted that while there was no express prohibition against any debtor having more than one simultaneous bankruptcy case, the court considered it an abuse of process. *Id.* The court reasoned that allowing simultaneous cases could orchestrate continuing injunctions against parties seeking § 362 relief, confuse or prejudice creditors, create repetitive litigation, and cause consternation. *Id.; see also Russell*, 348 B.R. at 449 (considering the debtors' knowledge of the pendency of two bankruptcy cases as one factor for the rejection of a chapter 13 plan under a good faith test).

Some courts have taken a mechanical approach with respect to dismissing one of two simultaneous bankruptcy cases under the "single estate rule." Under this rule, a debtor may not maintain two or more simultaneous bankruptcy cases, because property cannot be an asset of two

estates.  *In re Baltrotsky*, 2004 WL 2937537 at *4 (D. Md. Dec. 20, 2004); *Associates Financial Services Corporation v. Cowen*, 29 B.R. 888, 894 (Bankr. S.D. Ohio 1983)("[a] debtor possesses only one estate for purposes of trusteeship").

This Court's sister bankruptcy court dealt with similar considerations in deciding whether to bar a debtor from prosecuting his chapter 13 petition filed subsequent to his still pending chapter 11 case.  *In re McMahan*, 481 B.R. 901 (Bankr. S.D. Tex. 2012).  In *McMahan*, the individual debtor filed a petition for an individual chapter 11 case, confirmed a plan, had not yet received a discharge, and, while the chapter 11 case was still open, filed a petition for relief under chapter 13.  *Id.* at 914.  The court found that the single estate rule could not apply as a bar to a second, concurrent case, because the property of the estate revests in the debtor when a chapter 11 plan is confirmed, and so there were not two estates with claims to the same property. *Id.* at 913.  The court dismissed the debtor's chapter 13 case on a different dividing line, specifically in that the debtor had not yet received his discharge from the chapter 11 case.  *Id.* The court supported its analysis from the precedent of *Freshman v. Atkins*, where the Supreme Court held that "pendency of the first [bankruptcy] application precluded a consideration of the second in respect of the same debt."  269 U.S. 121, 122 (1925).  The Supreme Court reasoned that where two simultaneous bankruptcy cases respected the same creditor debts, the pendency of the first case where discharge was not obtained would equate to a situation in the common law plea of "prior suit pending," which abhors "two suits at the same time for the same cause." *Id.* at 123.  The outcome in *Atkins* was for the Court to affirm the lower court's judgment, which allowed a discharge in the second bankruptcy petition *solely* with respect to the debts that had not been claimed in common to the pending first petition's debts. *Freshman v. Atkins,* 294 F.

867, 869 (5th. Cir. 1923), *aff'd, Atkins* 269 U.S. at 124.  Relating the *Atkins* test to the matter of the debtor's simultaneous bankruptcy cases in *McMahan*, the court found that the debtor's subsequent chapter 13 case involved the same creditors, save one new creditor, as the debtor's prior and pending chapter 11 case, thus rendering the same effect of holding "two suits at the same time for the same cause."  481 B.R. at 914 (citing *Atkins*, 269 U.S. at 123).  The court concluded that without receipt of a discharge in the prior chapter 11 case, the debtor's subsequent chapter 13 case must be dismissed.  *Id.*; *see also In re Turner*, 207 B.R. 373, 378 (2d Cir. BAP 1997) (declaring a subsequent chapter 13 case a nullity where it is filed during the pendency of a chapter 7 case that has not issued a discharge).

Unlike the sister court in *McMahan*, this court is faced with different issues that do not raise the proposition of discharge as the dividing line in allowing a subsequent chapter 11 case.  Unlike in *individual* chapter 11 cases, where the debtor does not receive a discharge of debts until payments under the plan are fully completed,[3] the effect of plan confirmation in non-individual chapter 11 cases is to grant a discharge of pre-confirmation debts, unless otherwise provided by the plan.  1141(d)(1).  In JCP I, Debtor's Plan of Reorganization provisioned for discharge of all debts pursuant to § 1141 immediately upon confirmation.  [Case No. 11-70827; ECF No. 45 at 11-12].  Therefore, the JCP II case is unlike that in *McMahan*, where the debtor's second petition was barred because it regarded debts that had not yet been *discharged* in the previous case.  *In re McMahan*, 481 B.R. at 914.  Here, JCP I's pre-confirmation debts from the prior chapter 11 case were discharged on the Effective Date of the Plan (Nov. 4, 2012), pursuant to this Court's Order of Confirmation.  [Case No. 11-70827; ECF No. 64].

---

[3] 11 U.S.C. § 1141(d)(5)(A)

The instant case is factually inapposite to the foregoing line of cases, but it raises no less of a concern under the good faith standard for dismissal. While not regarding debts and creditors for which there has been *no discharge* from a prior, pending chapter 11, JCP II's instant case raises an issue under the terms of the statutory language governing chapter 11 plans. By the terms of § 1127(b), the "proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan." § 1127(b).   The corollary to this principle is that a plan may not be modified after there is substantial consummation.  *See* Kenneth M. Misken and Evagelia E. Papadimas, *Chapter 22 – When One Chapter 11 Filing Just Is Not Enough,* 23 J. BANKR. L & PRAC. NL ART. 4 (2014). Only *individual* debtors have the opportunity to modify a plan at any time during the post-confirmation stage and before full completion of plan payments, whether or not substantial consummation has occurred.   11 U.S.C. § 1127(e).   The effects of plan confirmation are governed by § 1141, which provides that "the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor," whether or not they have accepted the plan.  11 U.S.C. § 1141(a).  Finally, § 1112 governs case conversion, providing that a party in interest may request that the chapter 11 case be converted to chapter 7 or dismissed "for cause."  11 U.S.C. § 1112(b)(1).

A reading of the interplay between §§ 1112(b)(1), 1127(a), and 1141(a) indicates the mischief that may be wrought by serial chapter 11 filings in which the previous chapter 11 plan had been substantially consummated; this mischief can potentially emasculate the dictates of the statutory framework. Under § 1127, non-individual debtors in a chapter 11 case may modify a

plan until the time in which such plan has been substantially consummated. This opportunity is thereafter foreclosed.  Under § 1141, the terms of the confirmed plan become binding. Section 1112 contemplates the possibility of conversion to a chapter 7 case. The combined reading of these sections *in pari materia* implies that plans may be relied upon by interested parties as a new contract displacing old debts, especially where substantial consummation portends a finality in which the debtor may no longer modify a plan. Where the debtor defaults, § 1112 provisions for conversion to chapter 7 or dismissal, absent "unusual circumstances." While the Code does not contain an explicit prohibition against a debtor filing successive or simultaneous chapter 11 cases in which the first case's plan was substantially consummated, such a circumvention of the statute's rules is certainly a consideration as to whether the second chapter 11 case was filed in good faith. *Matter of Buoy, Hall & Howard and Associates* is instructive as to this concern.   208 B.R. 737 (Bankr. S.D. Ga. 1995).  In *Buoy*, the court presided over a case in which the debtor had a previously filed chapter 11 case in which a plan was substantially consummated, and the debtor filed a second case two years later.  *Id.*  The court found that "[a] debtor should not be permitted to routinely file a successive Chapter 11 reorganization where it has defaulted on a confirmed, substantially consummated plan of reorganization, because such an effort would, in effect, constitute an impermissible attempt to modify a substantially consummated plan."  *Id.* at 743. The court moreover concluded that it was required to consider a traditional good faith analysis, but "[t]o require no greater scrutiny of the subsequent case is to completely ignore Sections 1127 and 1141."  *Id.*  Thus, the court held that in its good faith analysis, it must consider the first filing and the circumstances surrounding default in order to assess whether the filing of the second petition was an attempt to thwart the initial bankruptcy proceedings.  *Id.*

Functionally, the court assessed whether the filing of the subsequent case was so "related in time or substance" so as to offend "traditional notions of *res judicata*" and whether the debtor otherwise evidences good faith in the subsequent filing. *Id.* In *Matter of Elmwood*, the Fifth Circuit considered the serial filing of a chapter 11 where the confirmed plan from the first case had been substantially consummated. 964 F.2d 508 (5th Cir. 1992). Employing a good faith analysis, the court found that there was no *per se* prohibition against serial filings, but the court did find it necessary to consider whether the filing of the second petition was an attempt to evade the Code's prohibition against modifying a substantially confirmed plan. *Id.* at 511. The court found that the debtor bargained for three years in the first bankruptcy case and thereafter sought to avoid its obligation by filing a second case. *Id.* The court indicated that "changed circumstances" that are "unforeseeable" may justify the filing of a second case under a good faith analysis. *Id* at 512-13. There, the debtor failed to show that its circumstances were unforeseeable. This Court's analysis is unaffected by the Supreme Court's ruling in *United Student Aid Funds, Inc. v. Espinosa*. 559 U.S. 260 (2010). In *Espinosa*, the Supreme Court reviewed an appeal in which a creditor was ordered to cease collecting from the debtor on his student loans, the order of which was based on a flawed, but confirmed plan from three years prior that provisioned for the partial discharge of the debtor's student loans. *Id.* While the Supreme Court noted that the plan's confirmation violated § 523(a)(8)'s requirement to find undue hardship before allowing for the discharge of student loans, the Court found that the lower bankruptcy court had jurisdiction to confirm a plan *ultra vires* and the student loan creditor had notice of the provisions in the plan and a chance to timely appeal or object; having failed to do either, the Court concluded that the requirements of due process were satisfied. *Id.* at 275.

*Espinosa*, in its essence, was a federal rules case based on Federal Rule 60(b)(4), and is therefore not authoritatively instructive as to how the substantive statutory limitations §§ 1127, 1141, and 1112 affect a good faith analysis.

*Bouy* is instructive in assessing the evidence for good faith in the context of a serial chapter 11 filing.  208 B.R. at 744.  The *Buoy* court found five factors useful to its good faith analysis:

1.  The length of time between the two cases;

2.  The foreseeability and substantiality of events which ultimately caused the subsequent filing;

3.  Whether the new plan contemplates liquidation or reorganization;

4.  The degree to which creditors consent to the filing of the subsequent reorganization

5.  The extent to which an objecting creditor's rights were modified in the initial reorganization and its treatment in the subsequent case.

*Id.*  In *Buoy*, the court presided over a second chapter 11 bankruptcy after the debtor defaulted on its substantially consummated plan from the first case. Part of the debtor's argument for its good faith was that its hotel business, near the Savannah International Airport, was facing decline due to the Airport Commission moving its terminal miles away from the hotel, Key Airlines declaring bankruptcy, and two major airlines discontinuing its service into Savannah.  *Id.* at 742. The court found good faith where the sole objecting creditor was fully secured, substantial  and unforeseeable market changes had occurred, other major creditors believed that the second reorganization would be successful, and the debtor had a newly initiated breach of contract claim

against a 3rd party that could assist in the prospect of a successful new reorganization.  *Id.* at 744.

      This Court cannot conclude that Debtor has demonstrated its burden to show that it filed the JCP II case in good faith. There is only one objecting creditor, RREF, but it is not fully secured.  While this Court concludes that it should grant RREF's Motion for Relief From The Automatic Stay, thereby protecting RREF's secured interest, RREF's declared unsecured interest amounts to a substantial $49,354.70.  [Case No. 15-70391; ECF No. 1 at 10].  There are no substantial and unforeseen circumstances that would justify the filing of a serial chapter 11. Indeed, Debtor defaulted under the terms of a confirmed plan from the JCP I case. JCP I failed to perform under a material term in the plan, in that it was to transfer Lots 9, 10, 11, and 12 to satisfy the debt to RREF accounted for in Class 5.   Additionally, JCP I failed to complete payments to RREF under the confirmed plan.  JCP I's testimony at the hearing evidenced that only one and perhaps two payments at most were made to RREF.   Debtor reopened the JCP I case to presumably sue RREF in an adversary for RREF's alleged breach of the terms of the plan by failing to issue a release with respect to Julio Perales. That claim might have made for a persuasive argument in favor of showing good faith had JCP I shown that such a claim could enhance its prospects for a successful reorganization. JCP I did not show this. Instead, Debtor reopened the JCP I case on June 19, 2015, never showed any objective indication that it would pursue the alleged adversary, motioned for a final decree closing the 2011 case, and then proceeded to file the JCP II case, a serial chapter 11, on the eve of foreclosure, just two months after reopening the JCP I case. JCP II's prospect of proposing a new, liquidating plan is a more promising claim. However, in showing evidence of the prospect that this new liquidation was to

be successful, Mr. Perales asserted that he believed that the collective value on JCP II's remaining property, Lots 3, 4, 7, and 8 was $630,000, despite its listing at $407,000 on the schedules. [Case No. 1570391; ECF No. 1]. Mr. Perales testified that he had no expertise in real estate valuation and no professional appraisal to contradict the publicly recorded tax valuation reflected in the petition. In fact, all JCP II could offer were Mr. Perales's beliefs, a suggestion from Counsel that the neighborhood is starting to develop, and the assurance that JCP II has been attempting to sell the Lots outside of bankruptcy for 3 or 4 months. JCP II has had its chance to sell Lots 3, 4, 7, and 8, and this Court has not been shown reason as to why JCP II has a better chance of selling above the value of all the secured claims to the Lots, which is at $482,808.70. This outcome is hardly unforeseen. JCP I knew that creditors would have a right to foreclose on its property in the event that JCP I defaulted on the confirmed plan. Instead, JCP I chose to leverage Class 4 in order to coerce RREF into compliance with the plans terms under Class 5. This Court has been shown insufficient evidence to conclude that the filing of the 2015 case was anything other than an attempt to circumvent Congress's statutory framework for chapter 11 cases.

JCP II has failed to establish that it filed its 15-70391 case in good faith. The case will thusly be dismissed.

## C. Motion For Relief From The Automatic Stay

As alternative relief to the Motion to Dismiss in JCP II, RREF seeks relief from the automatic stay in its Motion for Relief from the Automatic Stay. [Case No. 15-70391; ECF No. 14]. In its Motion for Relief, RREF alleges that it is entitled to relief from the automatic stay on account of its claim under Class 4 of the JCP I case's confirmed plan, secured by Lots 3, 4, 7,

and 8.  *Id*.  RREF specifically argues that it is entitled to relief from the automatic stay under 11 U.S.C. §§ 362(d)(1), 362(d)(2), 362(d)(4).  *Id.*

Generally, where a debtor petitions for bankruptcy relief, he may enjoy the immediate benefits of a statutorily created mechanism known as the automatic stay.  11 U.S.C. § 362. Upon petition, the automatic stay prevents entities from engaging in a multitude of actions, such as: commencing non-bankruptcy judicial proceedings against the debtor; enforcing prepetition judgments against the debtor or estate; and acts of obtaining or controlling property of the estate. § 362(a).  One purpose of the automatic stay is to provide the debtor with a "breathing spell" from creditors by staying their collection efforts.  *Matter of Commonwealth Oil Refining Co., Inc.*, 805 F.2d 1175, 1182 (5th Cir. 1986).  However, an additional purpose of the automatic stay is to protect the equitable distribution among similarly situated creditors by preventing a race to the courthouse, in which a single self-interested creditor may unilaterally collect on a debtor or estate's assets to the detriment of other creditors.  *Id*; *In re Halo Wireless, Inc.*, 684 F.3d 581, 588 (5th Cir. 2012); *Matter of S.I. Acquisition, Inc.*, 817 F.2d 1142, 1150 (5th Cir. 1987).

A creditor whose claim is secured by property of the debtor or the estate is not bereft of all remedy to act on the collateralizing assets. Section 362(d) delineates a host of separate grounds upon which a creditor may move a court to lift the automatic stay. Upon request of a party in interest and after notice and a hearing, a court shall grant relief from the automatic stay where justified under the scenarios delineated under the § 362(d)'s subsections.  § 362(d).

*Section 362(d)(1)*:

A court shall grant relief from the automatic stay "for cause, including the lack of adequate protection of an interest in property of such party in interest[.]"  11 U.S.C. § 362(d)(1).

"Cause" is not defined in title 11, which behooves courts to determine whether cause exists in a case-by-case approach. *In re Reitnauer*, 152 F.3d 341, 343 n.4 (5th Cir. 1998). RREF alleges two separate bases for finding § 362(d)(1) cause to lift the automatic stay. First, RREF claims that it is not adequately protected in its property interest, because taxes and insurance continue to accrue while Debtor remains in post-confirmation default. [Case No. 15-70391; ECF No. 14]. Alternatively, RREF argues that cause exists by virtue of JCP II's lack of good faith in filing a second bankruptcy case. *Id.* The purpose of adequate protection is to guard the secured creditor's interest from a decline in the value of the collateralized property. *In re Panther Mountain Land Development, LLC*, 438 B.R. 169, 189 (Bankr. E.D. Ark. 2010). To establish a *prima facie* case of cause due to a lack of adequate protection, the creditor seeking relief must provide evidence that the value of the collateralized property is declining or is threatened to decline in value as a result of the automatic stay. *Id.* Typically, a creditor will show a property's decline in value by comparing the value of that property at the time of the bankruptcy petition against the value of the property at the time of the lift stay hearing. *Id.* Upon the filing of the JCP II case on August 02, 2015, Debtor claimed an aggregated value of $407,000 for Lots 3, 4, 7, and 8. [Case No. 15-70391; ECF No. 1 at 4]. On evidence at this Court's October 21, 2015 hearing, JCP II showed that Lots 3, 4, 7, and 8 held an aggregated value of $406,343. [Debtor Ex. P-Q]. RREF has shown no evidence of "taxes and insurance" accruing so as to diminish the value of JCP II's property. In an apparent conflation of debt and value, RREF argues that it is no longer adequately protected *as a result* of Debtor's post-confirmation defaults. [Case No. 15-70391; ECF No. 14 at ¶ 43]. This assertion confuses the payments contemplated to redress secured debt and the underlying value of the property. While it may be true that a debtor can

show that payments it makes to a creditor on account of secured debt is adequately protecting the creditor, it may not be shown that a default on post-confirmation payments renders protection inadequate *per se*.

Alternatively, a court will find cause to lift the automatic stay where it has been shown that the debtor filed its bankruptcy petition in bad faith. *Matter of Little Creek Development Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986). The governing standards for assessing good faith in analyzing a § 362(d)(1) lift stay motion was handed down by the Fifth Circuit in *Matter of Little Creek Development Co*. In *Little Creek*, the Fifth Circuit presided over an appeal from a bankruptcy court judgment, which determined that cause to lift the automatic stay existed where the debtor's counsel admitted that its bankruptcy petition was filed solely to escape the necessity of posting a bond in an ongoing state court proceeding. *Id.* at 1070. In state court, the debtor had attempted to forestall foreclosure on its property by asserting a range of state law defenses. The debtor obtained a preliminary injunction, conditioned upon posting a sizable bond pending the conclusion of the litigation in state court. *Id.* Unable to afford posting the bond, the debtor filed a petition for bankruptcy, and the bankruptcy court lifted the automatic stay. The bankruptcy court found that counsel's admission that the debtor's only reason for litigating in bankruptcy court was its inability to post a bond to secure the preliminary injunction in state court was enough to find that the debtor had petitioned in bad faith. *Id.* In reviewing the bankruptcy court's decision and the district court's affirmation, the Fifth Circuit held that an assessment of good faith relies on a "conglomerate of factors rather than on any single datum" and "depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities." *Id.* at 1072. The Fifth Circuit then

proceeded to outline the typical recurring patterns associated with bad faith filings: the debtor has one asset; the secured creditors' liens encumber the single asset; there are few to no employees aside from the principals; there is little to no cash flow; there is no source of income to sustain a plan of reorganization or make adequate protection payments; there are typically few to no unsecured creditors; the property has been posted for foreclosure and the debtor has been unsuccessful in defending against foreclosure in state court; and the debtor and the creditor have proceeded to a standstill in state court, and the debtor has been required to post a bond it cannot afford. *Id.* at 1072-73.

This Court turns to whether the conglomerate of factors in the instant matter supports a finding that Debtor filed the JCP II petition in bad faith for the purpose of § 362(d)(1)'s cause to lift the automatic stay. The instant matter is technically not a single asset case, given the legal distinctions between Lots 3, 4, 7, and 8. However, the four lots, two of which are developed, represent the sole remainder of JCP II's property. At the time of the petition, JCP II's property was overly encumbered with secured claims by a measure of $482,808.70 in claims to $406,343.00 in property value. Debtor has significantly failed to maintain post-confirmation payments to RREF on account of Class 4, having made only one documented payment[4] since confirmation. [Creditor Ex. R]. Debtor also refused to turn over Lots 9, 10, 11, and 12 to RREF in satisfaction of the Class 5 claim. RREF has since managed to foreclose on those lots. Moreover, with respect to Class 3, Debtor has only made 33 payments from a total of 64 due payments over the course of October 24, 2012 to April 07, 2015. On testimony, Debtor's principal, Mr. Perales, testified that the reason for Debtor's refusal to turn over Lots 9, 10, 11,

---

[4] There is disagreement between the parties as to whether only a single $800 payment had been made on account of Class 4, as documented by Creditor's Exhibit R, or whether an additional $900 payment had also been made, as testified but undocumented by Mr. Perales.

and 12 in satisfaction of Class 5's claim was motivated by RREF's refusal to expressly grant a release of guarantor liability as to Mr. Perales with respect to Class 5, which was one of the terms from this Court's Order Confirming Plan.  [Case No. 11-70827; ECF No. 64 at 3-4].  Mr. Perales further attested that RREF's refusal to issue such a release was one of the reasons for Debtor's stonewalling of payments on Claim 4. Allegedly in an attempt to resolve this dispute over release, Debtor filed a motion to reopen the JCP I case, which this Court granted. However, the automatic stay having been lifted before the JCP I case was first closed in 2012, this Court entered an Order on July 16, 2015 to confirm that the automatic stay with respect to Lots 3, 4, 7, and 8 was terminated as to RREF and authorizing RREF to foreclosure on said lots.  [Case No. 11-70827; ECF No. 93].  Debtor has not initiated an adversary proceeding in either of its chapter 11 cases. Following this Court's Order Confirming the Termination of the Automatic Stay on July 16, 2015, and while the JCP I case remained open, Debtor filed a second chapter 11 petition, the JCP II case, on August 08, 2015. "A plan of reorganization, which resembles a consent decree, is akin to a contract between the debtor and its creditors that is approved by the bankruptcy court." *In re Arbors of House Associates Ltd. Partnership*, 1999 WL 17649, *3 (6th Cir. Jan. 4, 1999); *see also In re Stratford of Texas, Inc.*, 635 F.2d 365, 368 (5th Cir. 1981). Under § 1127, the proponent of a chapter 11 plan may modify that plan at any time after confirmation but before substantial consummation. Under § 1141, the non-individual debtor obtains an immediate discharge of all debts, and the provisions of the confirmed plan bind the debtor and creditors to its terms. Under this framework, creditors such as RREF have released their prepetition claims in consideration of the terms of a new contract, to which creditors are entitled to rely. Having defaulted on the final terms of the chapter 11 plan in JCP I, RREF

pursued its rights in state foreclosure proceedings. To file a new chapter 11 case with respect to the same creditors, same property, and same substantially unpaid debts as dealt with in a previous chapter 11 plan represents a circumvention of the statutory terms of §§ 1127 and 1141, and as such, heavily implies a bad faith subsequent filing. *Matter of Bouy*, 208 B.R. at 743 ("[a] debtor should not be permitted to routinely file a successive Chapter 11 reorganization where it has defaulted on a confirmed, substantially consummated plan of reorganization, because such an effort would, in effect, constitute an impermissible attempt to modify a substantially consummated plan"); *see also In re McMahan,* 481 B.R. at 901 .  Here, JCP II, with knowledge that the automatic stay had been lifted, filed a subsequent, simultaneous chapter 11 and thereby reobtained the automatic stay. This has prejudiced and frustrated the rights of RREF, who sought to foreclose on Lots 3, 4, 7, and 8 pursuant to this Court's authorization in the JCP I case. During testimony, JCP II pursued a novel argument as to why the facts have changed in the subsequent chapter 11: JCP II now seeks to propose a plan of complete liquidation, and it seeks the protection of an orderly second bankruptcy case in order to ensure the fair treatment of all of its creditors. JCP II additionally contends that it has attempted to negotiate with RREF in order to save Lots 3, 4, 7, and 8 from foreclosure, but that RREF has been unwilling to negotiate. Finally, this Court was reminded that RREF's supposed failure to issue an express release of liability as to Mr. Perales was the reason for Debtor's default under the treatment of Class 4 of the JCP I case's Plan.

JCP II's arguments are unavailing. This Court has already determined that RREF is entitled to foreclose on properties 3, 4, 7, and 8. To circumvent this determination and the statutory framework for a substantially consummated plan's finality would militate towards a

finding of cause to lift the stay. Debtor's attempted negotiations with RREF do not imply good faith here. RREF was entitled to rely on the provisions of the confirmed plan providing for payments on account of Class 4, and Debtor failed to make all but one payment. RREF was under no duty to negotiate over the parties' finalized rights and responsibilities under the confirmed and substantially consummated plan. Finally, the parties have shown that RREF did not issue an express release of liability as to Mr. Perales. Assuming that it was RREF's duty in consideration to issue such a release, such a provision fell under the Class 5 covenants. [Case No. 11-70827; ECF No. 64]. Debtor did not act in good faith by leveraging its promises to RREF under Class 4 in order to enforce the terms of Class 5, and thereafter obtaining the automatic stay from a second petition when Debtor did not get its way.

Viewed in light of the totality of the circumstances, this Court finds that there is cause to lift the automatic stay pursuant to § 362(d)(1).

*Section 362(d)(2)*:

Section 362(d)(2) states that :

A court shall grant relief to a secured creditor:

(2) with respect to a stay of an act against property… if

    (A) the debtor does not have an equity in such property; and

    (B) such property is not necessary to an effective reorganization;

§ 362(d)(2). Section 362(d)(2) represents an alternative avenue by which this Court grants RREF relief from the automatic stay. The first inquiry, regarding whether the JCP II has any equity in the property, relies on an assessment of the value of the property as compared to the amount of secured debt thereto. Where the secured claims over the property exceed the value of

the property, a debtor has no equity in the property for the purpose of § 362(d)(2). *See Matter of Sutton*, 904 F.2d 327, 329 (5th Cir. 1990) (equity "portends the difference between the value of the subject property and the encumbrances against it"); *see also In re Playa Development Corp.*, 68 B.R. 549, 553 (Bankr. W.D. Tex. 1986). The creditor moving for relief under § 362(d)(2) bears the burden of showing that the debtor has no equity in the property. *Matter of Canal Place Ltd. Partnership*, 921 F.2d 569, 576 (5th Cir. 1991). During this Court's hearing on the instant Motions, Mr. Perales testified as to his belief that Lots 3, 4, 7, and 8 held a combined value of $630,000. This valuation belies Debtor's scheduled valuations in its chapter 11 petition for the JCP II case, which values the Lots at a total of $407,000. [ECF No. 1]. In supporting his higher valuation, Mr. Perales testified that, in the surrounding neighborhood, 28 apartment units had been completed in the last 5 months and an additional 16 units were slated for construction. JCP II's Counsel suggested that the neighborhood development would naturally increase the value of JCP II's Lots. However, JCP II could not offer any professional appraisals to support Mr. Perales's opinion. Moreover, Debtor actively marketed the properties for sale for at least three months, to which no written offers to purchase have been obtained. This Court does not find Mr. Perales's higher valuation of Lots 3, 4, 7, and 8 credible, in light of the abject lack of any corroborating evidence aside from mere conclusory assertions. This Court therefore concludes that RREF has met its burden of establishing valuation, because it is eminently reflected in the Hidalgo County Tax Assessor's 2015 combined valuation of the Lots at $406,343, [Debtor Ex. P-Q], as reflected in JCP II's own scheduled valuation at $407,000. JCP II has not defeated RREF on the burden of proof simply by establishing conclusory contradictions. Turning to the secured debts on the property, no contradictions have been established to reduce JCP II's

declaration of $482,808.70 in secured claims over Lots 3, 4, 7, and 8.  [Case No. 15-70391; ECF No. 1].  Thus, this Court finds that the secured debts on Lots 3, 4, 7, and 8 exceed the value of the property. This Court therefore concludes that JCP II has no equity in the property for the purpose of § 362(d)(2).

This Court must also assess whether JCP II's retention of Lots 3, 4, 7, and 8 would not be necessary to an effective reorganization. The burden of establishing that there *is* a necessity for an effective reorganization rests in the debtor moving against § 362(d)(2) relief.  *Matter of Canal Place*, 921 F.2d at 576.  By testimony, JCP II asserts that it plans to offer a "liquidating" chapter 11 plan in which it would seek to sell the Lots for the highest possible price, thereby fairly maximizing the return value to all creditors. This Court must consider whether JCP II's asserted intentions to propose a plan to liquidate the entirety of its assets in order to maximize a return for creditors can faithfully support the "effective reorganization" test under § 362(d)(2).  To show that there is a necessity for effective reorganization, a debtor must show that there can be an effective reorganization in the sense that there is "a reasonable possibility of a successful reorganization within a reasonable time."  *United Sav. Ass'n of Texas v. Timber of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 367 (1988).

To date, the Fifth Circuit has not dispositively ruled on whether a plan to liquidate all assets and pay the owed proceeds to creditors constitutes a "reorganization" as a matter of law for the purpose of the effective reorganization test in § 362(d)(2). In *In re Timbers of Inwood Forest Associates*, the Fifth Circuit opined in footnote form that

> [b]ecause a plan of reorganization under Chapter 11 can… [now]… consist of a
> liquidation of the debtor, there may be circumstances under which the debtor is

> able to satisfy the "effective reorganization test of § 362(d)(2) by showing that the
> property at issue is necessary to an effective liquidation of the debtor under
> Chapter 11, as distinguished from an effective rehabilitation of the debtor.

*Timbers*, 808 F.2d at 371 n.14.  In the later decided *Matter of Sutton*, the Fifth Circuit had an occasion to examine the evidentiary standards of examining § 362(d)(2) where the debtor sought to execute a plan to liquidate all of his property, consisting of two separate tracts, to pay his creditor. 904 F.2d at 327.  There, the Fifth Circuit affirmed the district court's decision to affirm the bankruptcy court's order lifting the automatic stay under § 362(d)(2).  904 F.2d at 331.  The Fifth Circuit reasoned that the bankruptcy court was not clearly erroneous in finding that an effective reorganization was not feasible within a reasonable amount of time under the debtor's evidentiary burden of proof where: the debtor offered no testimony about the form his plan would take, or when it could be proposed and brought to fruition; the debtor merely attested to an intention to reorganize by liquidation of all of his property; the debtor had no net income and was in arrears on tax payments to the property; the debtor had attempted to sell one tract for three years without success; and the debtor's second tract was heavily vandalized and had only one tenant.  *Id.* at 330-31.  The Fifth Circuit's opinion in *Matter of Sutton* is not authoritative on whether a liquidating plan can constitute a reorganization that requires effectiveness under § 362(d)(2) as a matter of law, because the debtor would have lost on evidentiary grounds in any case. This Court's sister bankruptcy Court concluded that in a chapter 7 case, there could be no effective reorganization as a matter of law (thus automatically fulfilling prong 2 of § 362(d)(2)), because a chapter 7 case strictly involves liquidation.  *In re Young*, 2007 WL 128280 at *6 (Bankr. S.D. Tex. Jan. 10, 2007).  Similarly to *Matter of Sutton*, the *Young* court proceeded to

factually show why the debtors did not need the property for an effective reorganization anyway. *Id.*

Setting aside the matter of law question, this Court finds *Matter of Sutton* instructive on the factors that a court should examine when determining whether a debtor has met its evidentiary burden of showing that there is a "reasonable possibility of a successful reorganization within a reasonable time." *Timbers*, 484 U.S. at 376. Under the guidance of the Fifth Circuit, this Court concludes that JCP II has not met its evidentiary burden. In the four months since Debtor filed the JCP II case, Debtor has neither submitted the supposed liquidating plan nor offered any detailed testimony of its contemplated form, proposal date, or consummation date. JCP II offered no evidence as to whether the contemplated liquidating plan would be confirmable, especially in light of the fact that there are only two secured creditors, one of which (RREF) clearly objects to a new plan and neither of which have been shown to be guaranteed a better outcome than can be had at a chapter 7 liquidation.[5] Debtor has attempted for three months to make a sale of its property in a neighborhood where, by Debtor's own testimony, developers have chosen to build rather than buy. The fact that Debtor offers no timelines to its plan to liquidate is especially afflicting to its position, since Debtor has defaulted on a substantially consummated plan confirmed in 2012, RREF has already diligently attempted to foreclose on Lots 3, 4, 7, and 8, and Debtor filed a new chapter 11 case on August 02, 2015 that forestalled this foreclosure. Were this Court prepared to find that JCP II could somehow confirm a liquidating plan under the sparse evidence presented, this is certainly no occasion to conclude that the "success" in executing a future sale of the property at some vague point, for some

---

[5] Under 11 U.S.C. § 1129(a)(7), to confirm a plan, each holder of a claim in an impaired class must either accept the plan or receive an amount not less than would be received if the debtor were liquidated under chapter 7.

unsubstantiated and hopeful valuation, constitutes success in a reasonable time under JCP II's evidentiary burden. With inadequate proof that there will be a successful reorganization within a reasonable time, this Court concludes that the property would not be necessary to an effective reorganization. Having concluded that JCP II failed to meet its burden of proof, this Court finds that there is no occasion to determine whether liquidating chapter 11 plans can be reorganizations as a matter of law.

Having found that JCP II has no equity in Lots 3, 4, 7, and 8 and has not proven that said Lots are necessary to an effective reorganization, this Court concludes that there is sufficient basis to lift the automatic stay pursuant to § 362(d)(2).

*Section 362(d)(4)*:

Section 362(d)(4) states that the court shall grant relief:

(4) with respect to a stay of an act against real property under subsection (a), by a creditor whose claim is secured by an interest in such real property, if the court finds that the filing of the petition was part of a scheme to delay, hinder, or defraud creditors that involved either

(A) transfer of all or part ownership of, or other interest in, such real property without the consent of the secured creditor or court approval; or

(B) multiple bankruptcy filings affecting such real property.

11 U.S.C. § 362(d)(4).

To find for relief under § 362(d)(4), three conditions must be satisfied. First, the debtor's current bankruptcy filing must be part of a "scheme." *In re Abdul Muhaimin*, 343 B.R. 159, 167 (Bankr. D. Md. 2006). Second, the debtor's scheme must be to delay, hinder, *or* defraud

creditors.  *In re Tajal Inv., LLC*, 2012 WL 6186159 at *2 (Bankr. D. Utah Dec. 12, 2012).  The current language of "or" in paragraph (4) reflects a 2010 amendment to § 362(d)(4), which changed "hinder, and" to "hinder, or."  Bankruptcy Technical Corrections Act of 2010, Pub. L. No. 111-327, § 362, 124 Stat. 3557, 3559 (2010).  This change in language represents a significant alteration in the construction of paragraph (4) from a conjunctive to a disjunctive test. *In re Tejal*, 2012 WL 6186159 at *2; *but c.f. In re Abdul Muhaimin*, 343 B.R. at 166 (pre-2010, court holds that the "and" creates a deliberate conjunctive test).  Therefore, the second condition to finding for § 362(d)(4) merely requires that the filing be part of a scheme to either "delay, hinder, or defraud." With respect to the third condition, § 362(d)(4) is disjunctive in the sense that relief requires only that the scheme either involve subparagraph (A)'s "transfer of property" or subparagraph (B)'s "multiple filings affecting the real property at issue."

Here, RREF claims that it is entitled to relief under § 362(d)(4) because Debtor's multiple bankruptcy filings were implemented as part of a scheme to delay, hinder, or defraud RREF.  [Case No. 15-70391; ECF No. 14]. Therefore, for the purpose of a § 362(d)(4) inquiry here, RREF must show that there was a scheme, the scheme involved an attempt to hinder, delay, or defraud RREF, and the scheme involved multiple bankruptcy filings affecting Lots 3, 4, 7, and 8.

"Scheme" is not defined by the Bankruptcy Code.  *In re Young*, 2007 WL 128280 at *9 (January 10, 2007).  However, this Court's sister bankruptcy court has interpreted "scheme" under its plain, defined meaning as "a plan or program of action." *Id.* (citing *Scheme*, *Merriam-Webster Dictionary*, 637 (Sidney Landau ed. 1998)); *see also In re Abdul Muhaimin*, 343 B.R. at 167 ("a plan or program of action; esp: a crafty or secret one").  Similarly, Black's Law

Dictionary defines "scheme" as "[a] systematic plan; a connected or orderly arrangement" and "[a]n artful plot or plan, usu[ally] to deceive others." *Scheme*, *Black's Law Dictionary*, 1546 (10th ed. 2014); *see also In re Duncan & Forbes Development, Inc.*, 368 B.R. 27, 32 (Bankr. C.D. Cal. 2006) ("[a] scheme is an intentional construct. It does not happen by misadventure or negligence... [A] scheme is an intentional artful plot or plan to delay, hinder or defraud creditors). For the purpose of § 362(d)(4)'s scheme, a court must clearly find that a bankruptcy case was filed by the debtor with the specific forward purpose of delaying, hindering, or defrauding a creditor through the protections of bankruptcy law.

In the matter at bar, this Court finds that the requirements of § 362(d)(4) are met. After Lots 9, 10, 11, and 12 were foreclosed and transferred in April 07, 2015, Debtor had the JCP I case reopened. Therein, this Court declared the automatic stay lifted, authorizing RREF to foreclose on Lots 3, 4, 7, and 8. On the eve of foreclosure, Debtor filed another chapter 11 case, JCP II, and triggered the automatic stay, which delayed and hindered RREF's ability to pursue its rights to foreclose on Lots 3, 4, 7, and 8 as authorized by this court, the rights conferred to RREF by operation of Debtor's default on its payments under the Confirmation Order, and the rights conferred to RREF by its status as a lienholder. This constitutes a second bankruptcy filing affecting the same real property subject to the stay from the first property, namely Lots 3, 4, 7, and 8. JCP II's testimony that it was forced to file a second bankruptcy case because RREF refused to negotiate for new reasonable terms to resolve Class 4's terms and any lingering disputes is of no avail to convince this court that there was no scheme to hinder or delay. Rather, JCP II's testimony shows that it intended to use a new automatic stay to get a new breathing spell and hinder or delay RREF's attempts to use its property right of foreclosure, for which RREF

already bargained in a substantially consummated plan, in an effort to drag RREF into the negotiating table once more. Debtor's conduct in filing the JCP II petition shows the very essence of a scheme to hinder and delay, bearing the argument of "good intentions to hinder and delay."

This Court thus concludes that under §§ 362(d)(1), 362(d)(2), and 362(d)(4), RREF is entitled to relief from the automatic stay, and it must be so lifted. Section 362(d)(4)'s remedy requires special consideration. Section 362(d)(4) relief, where granted, imposes an *in rem* remedy over the real property affected. *E.g. In re Young*, 2007 WL 128280 at *8. This Court therefore grants RREF *in rem* relief over Lots 3, 4, 7, and 8 in addition to traditional relief from stay over said Lots.

## V. Conclusion

Debtor has substantially consummated its plan from the 2011 case, and is therefore entitled to a final decree closing the case. Debtor's Motion for Final Decree is **GRANTED**. RREF is entitled to relief in the form of lifting the automatic stay pursuant to §§ 362(d)(1), (d)(2), and (d)(4). Pursuant to (d)(4), relief will also be provided in *in rem* form. RREF's Motion For Relief From the Automatic Stay is hereby **GRANTED**. Due to Debtor's lack of good faith in filing a serial chapter 11, RREF is entitled to relief in the form of dismissal of JCP II for cause. The case is hereby **DISMISSED**.

Separate Orders consistent with this opinion shall be issued simultaneously herewith.

SIGNED 11/05/2015.

Eduardo V. Rodriguez
United States Bankruptcy Judge